IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Miami Division)

NATHAN SEYMOUR,

    Plaintiff,

vs.

SPRECHMAN & FISHER, P.A., formerly known
as SPRECHMAN & ASSOCIATES, P.A.,

    Defendant.
_____/

## COMPLAINT FOR DAMAGES

Plaintiff, NATHAN SEYMOUR, sues Defendant, SPRECHMAN & FISHER, P.A. formerly known as SPRECHMAN & ASSOCIATES, P.A., and shows:

### Introduction

1. This is an action by NATHAN SEYMOUR against his former employer, SPRECHMAN & FISHER, P.A., for retaliation pursuant to the Fair Labor Standards Act of 1938, the Family Medical Leave Act of 1993 and the Florida Whistle Blower Protection Act. By the filing of this action, Plaintiff seeks damages and a reasonable attorney's fee.

### Jurisdiction

2. This action arises under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207 and 215(a)(3). The Court has jurisdiction over the claims pursuant to 29 U.S.C. § 216(b).

3. The claim arose within the Southern District of Florida, which is where venue is proper.

1

**Parties**

4.     Plaintiff, NATHAN SEYMOUR (hereinafter "SEYMOUR") a resident of Broward County, Florida, was at all times material, employed by Defendants as a collector and was an employee as defined by 29 U.S.C. § 203(e).

5.      At the time of his termination, SEYMOUR was an "eligible employee" as defined by the FMLA, 29 U.S.C. § 2611(2), in that he had been employed for at least twelve months by the Defendant and worked at least 1250 hours during the 12 month period prior to when he took FMLA leave for a "serious health condition," i.e., arterial blockages, in March and in May 2013.

6.      Defendant, SPRECHMAN & FISHER, P.A. (hereinafter "SPRECHMAN"), is a Florida professional association doing business in the Southern District of Florida.  SPRECHMAN is an enterprise engaged in an industry affecting commerce, is an employer as defined by 29 U.S.C. § 203(d), which has employees subject to the provisions of the FLSA, 29 U.S.C. § 207, in the facility where SEYMOUR was employed.

7.     SPRECHMAN is also an employer as defined by 29 U.S.C. § 2611(4), which has employees subject to the provisions of the FMLA in the area where Plaintiff was employed.

8.     At all times material, SPRECHMAN employed more than 10 persons, and was an "employer" as defined by the FWBPA.

**Factual Allegations**

9.     On January 29, 2013, Plaintiff SEYMOUR filed a lawsuit against Defendant SPRECHMAN in the Circuit Court in and for Miami Dade County, Florida.  The lawsuit raised a claim for unpaid overtime under the Fair Labor Standards Act ("FLSA").

10.     Shortly after Plaintiff filed his FLSA lawsuit claim against Defendant, SEYMOUR became seriously ill and was ordered by his physician to undergo two (2) cardiovascular surgical procedures to repair arterial blockages, a potentially life-threatening condition. In connection with the surgeries, SEYMOUR took sick leave that was approved by Defendant in accordance with the provisions of the Family and Medical Leave Act (hereinafter "FMLA").

11.     Upon his return to work from FMLA leave, on or about May 11, 2013, Plaintiff discovered that his paying collection files (hereafter referred to as a "bank"), had been misappropriated by the Defendants for the firm's own exclusive use, in direct violation of the company's own historical protocols, policies, and practices. SEYMOUR's bank had been developed over a period of six years and produced revenue of approximately half-a-million-dollars ($500,000.00) per year, which generated substantial bonuses for SEYMOUR in addition to his base pay.

12.     Upon discovering that his bank had been misappropriated, SEYMOUR immediately sought out the collection manager, Robert Lerner, for an explanation. Plaintiff was told by Mr. Lerner that Defendant's company policy dictates that after a 90-day absence a collector has to "start over from scratch" with a zero dollar bank. Plaintiff is not aware of any such policy and other similarly-situated employees who took medical leave have had their bank and other files protected and worked by fellow employees until their return.

13.     After he returned from FMLA leave, Defendants further retaliated against SEYMOUR by substituting the lucrative paying files that were in his bank with what is known in the industry as "deadwood files". Deadwood files are typically described as those files that have no current contact information available for the debtor such as an address and/or phone number,

and/or are those files in which all collection efforts have already been exhausted. Deadwood files are, for the most part, classified in the collection industry as virtually worthless.

14. With his bank having been wrongfully taken by Defendant, Plaintiff was prevented from attaining the bi-weekly performance-based bonus he very often enjoyed prior to the filing of his overtime claim against the Defendant, and prior to taking FMLA leave.

15. Additionally, any collector who starts out with a zero dollar bank typically receives a starting quota of $5,000.00 that he or she must collect every two (2) weeks before attaining eligibility for payment of a bonus. Defendant, however, ignored this policy, and assigned SEYMOUR a two-week quota of $38,000.00, which was later reduced to $34,000.00. This was the same quota he had for his half-million dollar bank, further ensuring that SEYMOUR would have virtually no possibility of attaining a bonus. As a result of this retaliation, SEYMOUR was unable to attain any bonus until October 2013.

16. A week or so after returning from FMLA leave, Robert Lerner called Plaintiff into the conference room. Mr. Lerner then reprimanded SEYMOUR, stating that his performance had dropped to below acceptable company standards because Plaintiff failed to make an average of 100 outgoing phone calls per day.

17. By replacing Plaintiff's bank with deadwood files that often lacked contact information for the debtor, Defendant made it virtually impossible for SEYMOUR to achieve the 100 outgoing phone calls per day standard.

18. Defendant further retaliated against SEYMOUR by cutting off his access to incoming telephone calls from debtors seeking to settle their accounts. Collectors depend upon these incoming phone calls from debtors who have received payment demand letters from the law firm and/or have been served with a lawsuit. Settlements derived from incoming phone calls

from debtors seeking to settle their debts comprise a good portion of a collector's productivity numbers and enhance his or her ability to attain a bonus.

19. After returning to work from FMLA sick leave, SEYMOUR noticed that his workstation was no longer receiving incoming calls from debtors. SEYMOUR immediately reported this condition to collection manager Robert Lerner, who took no corrective action.

20. At a meeting held several months later, on October 1, 2013, SEYMOUR again raised the subject of his workstation not receiving incoming phone calls from debtors. It was at that meeting that the law firm's computer technician volunteered for the first time that he rerouted incoming debtor calls away from SEYMOUR'S workstation under direct orders from Robert Lerner.

21. On August 9, 2013, the Director of Operations, Leonard Bendell, called SEYMOUR into his office to a meeting with himself and Robert Lerner. Mr. Bendell advised Plaintiff that on July 25, 2013, he was observed going on break at 3:02 p.m., which was SEYMOUR'S designated break time. Mr. Bendell then advised SEYMOUR that he was not permitted to leave the collection room floor if there were no managerial personnel present, despite the fact that other collectors are allowed to leave the collection room floor at their designated break time regardless of whether or not there is a manager present.

22. Mr. Bendell further advised SEYMOUR that his leaving the collection room floor in the absence of a manager was grounds for termination and he issued SEYMOUR a written reprimand that was to be placed into his permanent personnel file. Bendell further told SEYMOUR that the reprimand had to be signed and that failure to do so would also be grounds for termination. This was the first time that Plaintiff was reprimanded in nearly seven years of employment with Defendant.

23. In or about the last week of July, 2013, Plaintiff attended a meeting with Messrs. Bendell and Lerner where another collector was assigned to pull a random sampling of forty (40) recorded phone calls between collectors and debtors to ensure compliance with the Fair Debt Collection Practices Act ("FDCPA"). The calls were made on behalf of one of the firm's larger clients, Midland Funding, LLC. It was explained during the meeting that Midland Funding was sending representatives to the Defendant's law firm for the purpose of auditing those calls to verify the law firm's compliance with the FDCPA.

24. A few days after the meeting, the task of pulling the sample calls for Midland Funding was reassigned to SEYMOUR.

25. Shortly after he started to pull random calls, SEYMOUR discovered that the majority of the calls placed on behalf of Midland Funding were in violation of the FDCPA. Plaintiff had to pull 110 calls before he could identify 40 that were in compliance with FDCPA regulations and client protocols. The violations exposed by SEYMOUR in the small sampling of calls screened could potentially translate into significant fines against the Defendant's law firm, as well as damages, attorney fees, and costs. Plaintiff further concluded that since the law firm often made over one thousand such calls per day, the actual number of FDCPA violations likely numbered in the hundreds, and perhaps thousands.

26. Upon completing the project, SEYMOUR presented his findings to Bendell and Lerner and explained to them the significant number of FDCPA violations that he had found. When Lerner saw that Plaintiff's report mentioned the recorded calls that were in violation of the FDCPA laws, he flew into a rage and chastised SEYMOUR for including those calls in his report. Lerner and Bendell made it clear to SEYMOUR that the purpose of the project was to provide their clients with only those recorded calls that were in compliance with FDCPA

regulations and not to identify FDCPA violations, and that Midland Funding was never to be made aware of the firm's violations of FDCPA laws and regulations on Midland's behalf.

27. SEYMOUR told Lerner and Bendell that he was not comfortable with their apparent intent to deceive the client, and advised them that the proper course of action would be to self-disclose the violations and ensure they did not happen again.

28. On August 14, 2013, SEYMOUR sent a letter to Steven B. Sprechman, in which he summarized his findings that numerous calls had been made in violation of the FDCPA. The letter also detailed several examples of what SEYMOUR felt was unlawful retaliation by Lerner and Bendell. Mr. Sprechman never responded to the letter.

29. Despite SEYMOUR'S serious concerns about violations of the FDCPA, Messrs. Sprechman, Lerner, and Bendell took no real remedial action.

30. Approximately one week after SEYMOUR reported the FDCPA violations to Mr. Sprechman, he was called into Mr. Bendell's office where he was accused of himself committing an FDCPA violation. Mr. Bendell then played a recording of one of Plaintiff's calls with a debtor that he alleged was in violation of the FDCPA. Upon hearing the recording it was clear that SEYMOUR had committed no such violation.

31. Messrs. Lerner and Bendell then told SEYMOUR that violations of FDCPA laws are grounds for termination, and that since he, too, had purportedly violated FDCPA regulations, SEYMOUR would do well to keep his findings of the firm's many violations to himself. To the Plaintiff, the implied threat was clear: Remain silent and withhold his findings from the law firm's clients, and the authorities, with regard to the large number of FDCPA violations, or face the threat of termination of his employment and the loss of his livelihood.

32. In the two-week collection period ending October 5, 2013, SEYMOUR brought unusually lucrative collections into the firm and, for the first time since returning from sick leave in May, he surpassed his high quota and attained an amount sufficient to get paid a small bonus. However, Defendant intentionally failed to post some of SEYMOUR's collections for that collection period, thereby assuring that SEYMOUR would not receive his earned bonuses for those collections

33. On or about October 10, 2013, SEYMOUR sent a second email to Messrs. Lerner and Bendell regarding the FDCPA violations that he had previously disclosed in August 2013. In this letter, SEYMOUR advised Defendant that the proper course of action was to alert the authorities of the numerous FDCPA violations that SEYMOUR had discovered in August 2013.

34. Upon receipt of SEYMOUR'S letter, the Defendant immediately terminated SEYMOUR'S employment. At the termination meeting, SEYMOUR was told that he and over twenty other employees were being laid off due to the loss of business from Midland Funding, LLC, which was one of Defendant's larger clients. The layoffs were to include other collectors in addition to SEYMOUR.

35. In fact, no other collectors were laid off at the time that SEYMOUR was terminated. Moreover, Midland Funding had informed Defendant a couple of years earlier that it was no longer placing new files with Defendant for collection, and SEYMOUR's caseload only included approximately 15 Midland Funding files out of the 360 files that were in his queue, which is less than 5%.

36. There are no legitimate non-retaliatory reasons for SEYMOUR'S termination by SPRECHMAN.

**Count I/FLSA Retaliation**

37. Plaintiff realleges the allegations of Paragraphs 1 through 36 above.

38. Plaintiff's FLSA lawsuit against SPRECHMAN more particularly described above constitutes statutorily protected conduct under Section 15(a)(3) of the FLSA.

39. As a result of Plaintiff's FLSA lawsuit, Defendant SPRECHMAN retaliated against Plaintiff and discharged SEYMOUR from his employment for pretextual reasons.

40. Defendant's actions more particularly described above were directly related to and in response to Plaintiff's FLSA lawsuit, since there are no other justifiable reasons for Defendant's adverse action.

41. Defendant's adverse treatment of Plaintiff was pre-textual and a direct result of Plaintiff's opposition to Defendant's unlawful pay practices, and the conduct violated Plaintiff's rights against retaliation for opposing unlawful employment actions, which retaliation is proscribed by the FLSA.

42. WHEREFORE, Plaintiff NATHAN SEYMOUR prays that this court will grant judgment against Defendant SPRECHMAN:

A. awarding Plaintiff all lost wages found by the court to be due to him, including pre-judgment interest;

B. awarding Plaintiff payment of liquidated damages in an amount equal to the lost wages due to him;

C. awarding Plaintiff his costs, including a reasonable attorney's fee; and

D. granting such other and further relief as is just.

**Count II/FMLA Violations**

43. Plaintiff realleges the allegations of Paragraphs 1 through 36 above.

44. Among the substantive rights granted by the FMLA to eligible employees is the right to "12 workweeks of leave during any 12- month period . . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee," 29 U.S.C. § 2612(a)(1), and the right following leave "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to an equivalent position, 29 U.S.C. § 2614(a)(1).

45. Plaintiff was engaged in statutorily protected activity when he took approved FMLA leave in 2013.

46. By reducing Plaintiff's compensation and ultimately terminating SEYMOUR after he took FMLA leave, Defendant denied or otherwise interfered with Plaintiff's substantive rights under the FMLA, 29 U.S.C. §§ 2615(a)(1), and unlawfully retaliated against Plaintiff for engaging in activity protected by the FMLA.  29 U.S.C. §§ 2615(a)(1) & (2).

47. There are no legitimate non-discriminatory or non-retaliatory reasons for Plaintiff's termination by Defendant.

WHEREFORE, Plaintiff, NATHAN SEYMOUR, prays that this Court will:

A. Find Defendant's actions toward SEYMOUR to be violative of his rights   under the FMLA;

B. Reinstate Plaintiff to the position that he had before he took FMLA leave;

C. Award SEYMOUR payment of all back wages and lost benefits found by  the Court to be due under the FMLA;

D. Award SEYMOUR an additional equal amount as liquidated damages for

Defendant's willful violation of the FMLA;

E. Grant such other and further relief as is just; and

F. Award Plaintiff his costs, including a reasonable attorney's fee.

### Count III/Whistle Blower Retaliation

54. Plaintiff realleges the allegations of Paragraphs 1 through 42 above.

55. Under the FWBPA, § 448.102(3), employees are protected from retaliation based on their having objected to any activity, policy, or practice of the employer that is in violation of a law, rule, or regulation pertaining to the employer or its business.

56. Plaintiff SEYMOUR engaged in protected activity under § 448.102(3) by objecting both verbally and in writing to SPRECHMAN's violations of the Fair Debt Collections Practices Act.

57. As a result of Plaintiff's complaints mentioned above, Defendant discharged Plaintiff from his employment for pretextual reasons.

58. Defendant's actions more particularly described above were directly related to and in response to Plaintiff's objections to Defendant's willful violations of the FDCPA, since there are no other justifiable reasons for Defendant's adverse action.

59. Defendant's adverse treatment of Plaintiff was pre-textual and a direct result of Plaintiff's objections to Defendant's unlawful practices, and the conduct violated Plaintiff's rights against retaliation for opposing unlawful practices, which retaliation is proscribed by the FWBPA.

60. As a result of Defendant's unlawful conduct in violation of § 448.102, Fla. Stat., Plaintiff SEYMOUR has suffered compensatory damages, including, past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses.

WHEREFORE, Plaintiff, NATHAN SEYMOUR, respectfully requests the entry of judgment in his favor:

    A.    Declaring Defendant's conduct to be in violation of the FWBPA;

    B.    Enjoining Defendant from further engaging in such conduct;

    C.    Awarding SEYMOUR back pay, front pay in lieu of reinstatement and other compensatory damages;

    D.    Awarding SEYMOUR his costs and reasonable attorney's fees pursuant to § 448.104, Fla. Stat., and;

    E.    Granting such other and further relief as may be deemed just and proper.

Respectfully submitted,

/s/ Christopher C. Sharp
Christopher C. Sharp, Esq.
Fla. Bar No. 996858
E-Mail: csharplaw@aol.com
SHARP LAW FIRM, P.A.
660 East Hillsboro Blvd., Suite 105
Deerfield Beach, Florida 33441
Telephone: (954) 332-9077
Facsimile: (954) 919-1502

Dated: August 22, 2014    Counsel for Plaintiff